**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| —————————————— x | | Case No. _____ |
| ADELLA GONZALEZ, on behalf of herself and all others similarly situated, | : : | **REVISED CLASS ACTION COMPLAINT** |
| *Plaintiff*, | : : : | DEMAND FOR JURY TRIAL |
| v. | : : | |
| OUTLIERS, INC. d/b/a THESIS NOOTROPICS, | : : : | |
| *Defendant*. | : : : | |
| —————————————— x | | |

Plaintiff ADELLA GONZALEZ ("Plaintiff"), on behalf of herself and all others similarly situated, alleges the following class action complaint (the "action")  against Defendant OUTLIERS, INC. d/b/a THESIS NOOTROPICS ("Defendant") for violations of state and common law seeking damages, restitution, disgorgement of profit into a constructive trust, pre- and post-judgment interest, and reasonable costs and attorneys' fees upon personal knowledge as to herself and her own actions, and upon information and belief, including the investigation of her counsel as follows:

## INTRODUCTION

1.      Plaintiff Gonzalez and Class members are purchasers of over-the-counter supplements which are produced, marketed, and sold by Defendant and were deceived by misrepresentations with respect to the sale of each of Defendant's supplement products (the "Products").[1]  The Products are, according to Defendant, "[o]bsessively formulated nootropics designed to enhance your brain's natural functions from increasing blood flow to sparking neurogenesis."[2][3]

---

[1] The Products include, but are not limited to: THESIS CLARITY, THESIS CONFIDENCE, THESIS ENERGY, THESIS LOGIC, THESIS MOTIVATION, THESIS NEUROPROTECTION, and THESIS STRESS RESET.  Critically, none of the Products contain the same active ingredient(s) as the prescription medications that they are compared to in advertising.

[2] https://takethesis.com/products, (last accessed Dec. 24, 2025).

[3] According to the National Institute of Health, a "[n]ootropic, also known as 'smart drugs,' are a diverse group of medicinal substances whose action improves human thinking, learning, and memory, especially in cases where the functions are impaired."  *See*, Matej Malek, Pavel Tlustos, and Panteleimon Giannakopoulos, "*Nootropics as Cognitive Enhancers: Types, Dosage and Side Effects of Smart Drugs*," NATIONAL LIBRARY OF MEDICINE (PUBMED CENTRAL ONLINE) (Aug. 17, 2022), at https://pmc.ncbi.nlm.nih.gov/articles/PMC9415189/.

2.     Specifically, Defendant sells stimulants on the internet and elsewhere without a prescription which are marketed as being directly comparable to prescription medication stimulants including Adderall, Vyvanse, and others.   Adderall and Vyvanse are not only prescription medications but controlled substances.   Defendant engages in a systematic advertising campaign on social media, Defendant's own website, and elsewhere which pushes a dangerous and deceptive narrative that their Products are comparable to controlled substances and yet do not need a prescription while omitting the truth: the Products do not have the same abilities, efficacy, or medical recognition that actual prescription medications do.   Additionally, Defendant does not warn of potential side effects to the 7.3 million people who use Defendant's products.

3.     Defendant's conduct represents a serious and concerning crossroads of what happens when mental healthcare becomes too difficult or expensive to obtain while social-media driven companies attempt to fill the void with products that do not comport with the laws created to protect patients from these very types of abuses – as well as common practices within the medical industry itself.   Defendant's disturbing website and social media advertising of the Products would mislead any consumer into believing that they have the same capabilities that prescription medications do – let alone controlled substances.   Incredibly, there are even advertisements from social media which depict the perception of Thesis' Products next to images of cocaine as well as Adderall, while also comparing the dopamine produced by the Product to cannabis, online gambling, and pornography.

4.     Defendant's website also has a "quiz" which diagnoses users with DSM disorders and mental illnesses to select the best Product for that diagnosis.   Some of the questions that the "quiz" asks are specifically tailored to medical needs, including discussions about: cortisol, serotonin and dopamine levels; consumption of ultra-processed foods; smoking history; as well

as a prospective patient's history with decision-making, anxiousness, mood imbalance, sleep issues, caffeine intake, and ability to focus.

5.      While Defendant uses numerous methodologies to disclaim liability for their conduct (*e.g.* warning that the "quiz" is not medical advice) the collection of protected health information and then the use of that information in recommending an over-the-counter supplement compared directly to a prescribed controlled substance cuts against any halfhearted attempts to escape the very conduct Defendant attempts to immunize itself from.  Defendant's only goal is to sell as much of their Products as possible – cutting corners and deliberately choosing not to abide by the very same process that the rest of the pharmaceutical industry has followed for over a century.

6.      There are strict guidelines for the labeling of supplements such as the Products. For example, the Food and Drug Administration ("FDA") does not allow for the sale of supplements which are intended to prevent, cure, or treat a disease or a health-related condition linked to disease.

7.      Yet, this exactly what Defendant does with respect to its sale of the Products. These Products, according to the Food, Drug, and Cosmetic Act should be prominently displayed and labeled in bold with the following statement in order to adequately convey to consumers that the Product was not approved by the FDA: "This statement has not been evaluated by the Food and Drug Administration.  This product is not intended to diagnose, treat, cure, or prevent any disease."  *See,* 21 U.S.C. § 343(r)(6); 21 C.F.R. § 101.93(c) (hereinafter, the "FDA Warning").

8.      However, the warnings required by the FDA are entirely missing, are inadequate, or are overridden because of Defendant's conduct.

a.  <u>Missing FDA Warning</u>:  On the checkout window, including that which was used by Plaintiff when she purchased the Products, she was not exposed to the FDA Warning at all as it is hidden on the bottom of the page and does not get displayed unless the user seeks it.

b.  <u>Inadequate Warnings</u>:   The warnings on the Products themselves are not prominently displayed nor are they in bold:

c.  <u>Overridden by Defendant's Conduct</u>: Finally, the Products are frequently compared to actual prescription medication which is used for medical purposes – which misleads consumers into believing that the Products are replacements for prescription medications, which they are not.

9.      The vital warnings must appear on every single panel or page on which medical representations are made – which Defendant fails to do.  According to federal law, the failure to follow the disclaimer requirements renders a non-compliant supplement as misbranded, unapproved, and unlawful.  21 U.S.C. §§ 321(g)(1), 331(d), 343(r)(6), and 335(a).

10.     Without the proper disclaimers, representations about the structure or function of a supplement expresses to consumers that the Products are a medication capable of treating or preventing disease, even without necessarily mentioning the disease itself.  *See,* 65 Fed. Reg. at 1005.  There is an implicit danger – especially with stimulant products like nootropics – with this conduct because the marketing Defendant uses encourages consumers to forgo a medical diagnosis or treatment and self-treat themselves based on representations made by Defendant. This is especially so since Defendant includes numerous medical studies on its website and in marketing materials as well as representations about the product being "clinically" studied or proven.

11.     Against this backdrop, Plaintiff Adella Gonzalez, on behalf of herself and all others similarly situated, brings this action seeking actual damages, statutory damages, restitution, disgorgement of profit into a constructive trust, pre- and post-judgment interest, and reasonable costs and attorneys' fees under state statutes and common law doctrines due to Defendant's intentional acute efforts to falsely advertise supplements as a replacement for prescription medication – which they are not.  As a result of the foregoing, Plaintiff Adella Gonzalez and Class members (defined below) were harmed by paying a price premium for the Products which they otherwise would not have paid due to the misrepresentations made about on packaging and in advertising (as well as omissions about the Products) – and would not have purchased the Products at all.

## JURISDICTION AND VENUE

12.     *Subject Matter Jurisdiction.*  This Court has subject matter jurisdiction over this Action pursuant to the Class Action Fairness Act of 2005 ("CAFA") because there are (a) more than 100 members of the proposed classes, (b) some members (including Plaintiff Adella Gonzalez) of the proposed classes have a different domicile or citizenship from the Defendant, and (c) the claims of the proposed class members exceed $5 million, exclusive of costs and fees. Specifically, there are as many as 7.3 million members of the proposed class according to Defendant's website; Plaintiff Gonzalez is domiciled in Louisiana while Defendant is headquartered in New York; and the measure of damages (statutory damages as well as a price premium paid on every package of the Products during the Class Period) as alleged well exceeds $5 million dollars.

13.     *Personal Jurisdiction.*  This Court has personal jurisdiction over Defendant because: Defendant is headquartered and registered to do business in New York, and all of the

Defendant conducts significant business in New York such that they purposefully availed themselves of the privilege of doing business in New York.

14.    *Venue.*  Venue is proper in this Court because Defendant is located in and transacts business within this District, and a substantial part of the events giving rise to Plaintiff's claims took place in this District.

## PARTIES

### PLAINTIFF

### *Plaintiff Adella Gonzalez*

15.    Plaintiff Adella Gonzalez is domiciled in Louisiana and resides in Covington, Louisiana.

16.    Plaintiff Adella Gonzalez purchased the Products for her own use through Amazon during the Class Period.  According to Plaintiff Adella Gonzalez, she bought the Products because she relied on Defendant's representations, including that the Products were supplements capable of treating symptoms of disease – including lack of focus, reduced brain functionality and metabolism, and trouble with logistical and executive functioning.   Specifically, Plaintiff Adella Gonzalez purchased the 4-in-1 Brain Supplement Bundle, which included the Thesis Clarity Product – as well as three others which are substantially similar, Thesis Confidence, Thesis Logic, and Thesis Energy.

17.    At no point did the Products provide any warning about side effects, the Products did not contain proper FDA-approved disclosures as required by the law (e.g., ensuring that the disclosure was present on every panel or page with medical representations and that the disclosure was in bold and prominently displayed).

18.     Plaintiff Adella Gonzalez relied on these misrepresentations – and had she known the truth, she would not have purchased the Products or would have paid significantly less for the Products.

## DEFENDANT

### Defendant Outliers, Inc. d/b/a Thesis Nootropics

19.     Defendant Outliers, Inc. is a Delaware corporation which maintains its principal place of business located at 30 W. 24th Street, Floor 11, New York, New York 10010.  Defendant's registered agent is c/o Daniel Freed, 902 Broadway, Floor 6, New York, New York, 10010.

## FACTUAL ALLEGATIONS

### Defendant's Business and Misleading Statements

20.     One of the current major inequities in the United States' healthcare system involves the inability of patient access to affordable psychiatric diagnostic care through a medical professional and the unaffordable prices that psychiatric medication costs.  Generally, a psychiatrist appointment without insurance for a diagnosis costs approximately $200 for a 30-minute appointment – a price which is outside of an affordable range, especially considering 37% of Americans do not have $400 saved in the event of a medical emergency.[4] [5]

21.     The rise of supplements attempts to fill this void – sometimes in a manner which fails to adequately follow the same stringent guidelines the remainder of the medical profession

---

[4] Meaghan Rice, PsyD., LPC, "*How Much Does a Psychiatrist Cost Without Insurance*," TALKSPACE (ONLINE) (March 17, 2025), at https://www.talkspace.com/blog/how-much-does-a-psychiatrist-cost/.

[5] Aaron McDade, "*Here's How Many Americans Can't Afford a $400 Emergency – The Numbers May Shock You*," INVESTOPEDIA (ONLINE) (Sept. 22, 2025), at https://www.investopedia.com/here-s-how-many-americans-can-t-afford-a-usd400-emergency-the-numbers-may-shock-you-11814788.

is bound by.  Generally, the use of supplements is not problematic – nor is research that might lead a potential consumer to using them.  However, there are examples of supplement companies which do not have FDA approval to sell their products (products which are marketed as being capable of treating or preventing disease or symptoms of a disease) and which lack the proper disclaimers to ensure consumers are aware that their products do not have the necessary government oversight to be sold alongside medication.  Defendant is such an example.

22.    Defendant maintains a website, extensive digital advertising and marketing apparatus, and an almost unavoidable social media presence which makes it known that Defendant offers mind-altering supplements.  According to Defendant's own website, Defendant sells nootropic supplements which contain "[n]atural tools proven to support focus, reduce stress, and strengthen your mind."[6]  Defendant has a diagnostic questionnaire (which functions as a means of self-diagnosis) that recommends its Products.  The questionnaire focuses on medical needs, including discussions about: cortisol, serotonin and dopamine levels; consumption of ultra-processed foods; smoking history; as well as a prospective patient's history with decision-making, anxiousness, mood imbalance, sleep issues, caffeine intake, and ability to focus.

23.    The questionnaire also inlays citations from medical studies and universities which are meant to support the efficacy of the Products.  However, the studies themselves are not actually tested against the Products and the studies' authors likely have no idea whatsoever that their research is being weaponized to sell misbranded and mislabeled supplements.

24.    The questionnaire, which lists actual controlled substance medications for ADHD appears as follows:

---

[6] https://takethesis.com, (last accessed Dec. 25, 2025).



25.     Once the questionnaire, which is just a marketing tool, gives way to a lineup of its

Products which appears as follows:



26.    As can be seen from this lineup, the Products purport to offer memory and cognitive benefits, enhance mental productivity, improve focus, and increase energy levels.  Each of these is a symptom of mental illness – for example, inability to focus, depleted energy levels, and suppressed cognitive function is often associated with Attention-Deficit/Hyperactive Disorder ("ADHD") according to the DSM.[7]  Defendant's Products, while not solely focused on ADHD, make every effort to walk up to the line of acceptable medical behavior, before boldly opting to cross it as it pertains to ADHD itself.  Defendant's social media platforms and marketing tools are comprised of a barrage of ADHD-centric advertisements which link the Products to actual prescription ADHD medications, with an emphasis on two of the more popular ADHD prescription stimulants: Adderall and Vyvanse.  These appear as follows:



---

[7] "*DSM-5 Changes: Attention-Deficit/Hyperactivity Disorder [Symptom] Comparison*," National Institute of Health (June 2016), at https://www.ncbi.nlm.nih.gov/books/NBK519712/table/ch3.t3/; *see also,* "*Diagnosing ADHD*," Center for Disease Control (Oct. 3, 2024), at https://www.cdc.gov/adhd/diagnosis/index.html.



27.    Much of Defendant's solicitation of new customers takes place over social media, where Defendant has a large presence (including over 160,000 Instagram followers and millions of Instagram impressions) and participates in significant targeted advertising.   As previously stated, Defendant's advertising of these Products on social media is even more problematic and concerning.  For example, Defendant has "memes" which depict the Products next to cocaine and Adderall, comparing the dopamine produced by the Products to marijuana vaporizers, sports gambling, online shopping, and pornography, as well as pages on social media which also discuss the efficacy of the Product as compared to Adderall.

28.    These representations can be seen below:



 

**takethesis**                                    ···  ✕

## WE'RE SO SORRY…TAKE 65% OFF 💔

We knew people were calling it "Nature's Adderall."
But we didn't realize how deeply it would change
people's lives, until we started reading the reviews.

One person finally launched their business. One got
through grad school. One stopped feeling like a bad
parent.

But we should have made it easier to try. That's on us.

So for our Black Friday Sale, we're giving you our best
offers ever:

- $58 off a 1-month plan (45% OFF)
- $141 off a 2-month plan (55% OFF)
- $251 off a 3-month plan (65% OFF)

All with free shipping + $49 in gifts + a 30-day
money-back guarantee.

That's up to $300 in total savings.
No crash. No jitters. No prescription necessary.

Is 65% off too generous? Will we run out of stock?
Maybe. But it feels like the right thing to do.

Hope this helps,
Thesis Social Team





29.     At bottom, Defendant's Products are marketed and sold with outrageous misrepresentations that, if attached to medications actually regulated and brought to market through the FDA approval process, would have been pulled from pharmacy shelves before facing fines.   As can be seen above, none of these advertisements contain any FDA disclosures whatsoever.

### *Defendant's Products Are Mislabeled and Misbranded Supplements*

30.     The Food Drug and Cosmetic Act states that a "drug" is defined as an "article intended for use in the diagnosis, cure, mitigation, treatment, or prevention of a disease[.]" 21 U.S.C. §§ 321(g)(1)(B) and (g)(1)(C).   In order to bring a new drug to market, that drug must be approved by the FDA before placement in channels of commerce and distribution.   21 U.S.C. §§ 331(d), 335(a).

31.     Despite this, the FDA allows for an exception to this approval process, which requires a prominent FDA-required disclaimer.   21 U.S.C. § 343(r)(6)(A), (c).   Even so, the application of this exception applies only to truthful and not misleading statements.   21 U.S.C. § 321(g)(1) ("A food, dietary ingredient, or dietary supplement for which a truthful and not misleading statement made in accordance with [] this title is not a drug [requiring the approval process] solely because the label or the labeling contains [the disclaimer.]").

32.     The disclaimer, when applied to truthful and not misleading statements, should be bold and displayed prominently on each panel (of a package) or page which contains statements involving the diagnosis, cure, mitigation, treatment, or prevention of disease must read and appear as follows according to 21 U.S.C. § 343(r)(6) and 21 C.F.R. § 101.93(c):

**This statement has not been evaluated by the Food and Drug Administration.
This product is not intended to diagnose, treat, cure, or prevent any disease.**

33.     The prominence and display of the disclaimer is critical.  For nearly three decades, the FDA has insisted that "to meet the statutory requirement that the disclaimer" is prominently displayed, "*the disclaimer must be within the same field of vision within the statement itself.*"  *See,* 62 Fed. Reg. 49,859-65 (Sept. 23, 1997).

34.     Without following these disclaimers, as the federal register states, consumers would understand the supplement to be a therapeutic drug with approval of the FDA for sale. Additionally, marketing supplements with the same qualities a drug would have dangerously encourages consumers to self-treat serious conditions without the benefit of an actual medical diagnosis or treatment.  *See,* 65 Fed. Reg. at 1001, 1005, 1013, 1044-45.  Thus, the unwillingness to abide by the disclaimer requirement renders non-compliant supplements as misbranded, unapproved, and unlawful under federal law.  21 U.S.C. §§ 321(g)(1), 331(d), 343(r)(6) and 355(a).

35.     Defendant utterly fails to meet the disclosure requirements: (1) nearly all of the Defendant's statements about diagnosis, cure, mitigation, treatment, or prevention of disease do not contain any disclaimers whatsoever, (2) where the disclosure is included, it fails to be compliant because it is not in bold nor is it displayed prominently, and (3) even assuming that the disclosures were present, they do not mitigate for the comparisons of the Products to actual prescription medications – let alone allow for placement of the Products in advertisements next to pictures of Adderall and cocaine, or allow for the Products to convey that they have similar dopamine capabilities as cannabis consumption, sports gambling, online shopping, and viewership of pornography.

36.     An example of the failure to prominently and boldly show the disclaimers appears on the same packaging purchased by Plaintiff on Amazon, nor are they on the same page as the representations made:



37.     Defendant's violation of the disclaimer requirements render the labeling, marketing, and sale of Defendant's Products as misbranded and unlawful.  Further, the failure to include the mandatory disclaimer also renders the Products as unlawful drugs which do not have proper FDA pre-approval.  *See,* 21 U.S.C. §§ 331(d), 355(a).

## *Consumers Are Harmed By Defendant's Conduct*

38.     Due to the significant sales of the Products, there are over 7.3 million consumers who have purchased and are continuing to purchase the Products distributed, marketed, produced, and sold by Defendant.

39.     Based on the labeling, marketing, advertising, and other representations made online (on Defendant's website and other websites which sell the Products), on social media (on both Defendant's social media pages and elsewhere), and in digital advertising (on websites which host Defendant's ads for the Products), Plaintiff and Class members reasonably believed the Products had the same characteristics of the approved drugs that they mentioned in advertising – including Adderall.   Additionally, Plaintiff and Class members believed the Products had approval for and efficacy for treatment of mental illness, including ADHD.

40.     As a result, Plaintiff purchased Products that lacked the characteristics and benefits that they reasonably believed the Products had and would have.   Plaintiff would not have purchased the Products, purchased as many of them, or, alternatively, would have paid as much for them had they known the truth about Defendant's sales practices, misrepresentations, and general labeling and marketing practices.

41.     Plaintiff lost money and time as a result of Defendant's unlawful and deceptive conduct, which was misleading because Plaintiff did not receive the Products for which she believed she had paid.   By continuing to sell these Products, Defendant reaped and continues to reap increased sales and profits to its benefit, and to the detriment of consumers as well as its competitors.   Defendant not only knows that its carefully crafted and deliberate marketing is deceptive to the extent that it drives sales, but that the representations it makes are material to consumers' decisions to purchase the Products.

42.     As such, Plaintiff and Class members were harmed in the form of the monies they paid for the Products which they would not have otherwise paid had they known the truth.

## CLASS ACTION ALLEGATIONS

43.     Plaintiff Gonzalez brings this Action individually and on behalf of all other persons similarly situated pursuant to Fed. R. Civ. P. 23, seeking certification of the proposed classes (collectively, the "Class"):

> **Nationwide Class**: All persons within the United States who purchased the Products from the beginning of any applicable statute of limitations period through the date of judgment or until the conduct alleged ceases ("Class Period").

44.     Additionally, Plaintiff Gonzalez brings this Action on behalf of the following subclass:

> **Louisiana State Sub-Class**: All persons within the State of Louisiana who purchased the Products from the beginning of any applicable statute of limitations period through the date of judgment or until the conduct alleged ceases ("Class Period").

45.     Excluded from the proposed Class are Defendants and any such entities in which the Defendants have a controlling interest, the Defendants' agents, employees and legal representatives, any judge or judicial officer to whom this matter is assigned and any member of such judge or judicial officers' staff and immediately family, as well as all resellers of the Products.

46.     *Numerosity*.  The members of the Class are so numerous that joinder would be inefficient and impracticable.  Based upon Defendants' annual sales statistics, there are at least millions of Class members across the country.

47.     *Commonality*.  There are common questions of law and fact relevant to the Class, and these questions predominate over any questions affecting individual Class members.  These common questions of law and fact include, without limitation:

  i. Whether Defendant violated state and common law statutes and doctrines;

  ii. Whether Defendant engaged in the conduct as alleged;

  iii. Whether Defendant was negligent, grossly negligent, or negligent per se;

  iv. Whether Defendant were unjustly enriched;

  v. Whether Plaintiff was harmed;

  vi. The measure of damages to Plaintiff and Class members; and,

  vii. Whether Plaintiff is entitled to declaratory and injunctive relief.

48. ***Typicality***.  Plaintiff's claims are typical of those of other Class members because Plaintiff, like every other Class member, was harmed by way of the conduct as alleged herein. Plaintiff, like all other Class members, was injured by Defendants' uniform conduct.  Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class members, such that there are no defenses unique to Plaintiff.  The claims of Plaintiff and those of the other Class members arise from the same operative facts and are based on the same legal theories.

49. ***Adequacy of Representation***.  Plaintiff will fairly and adequately represent and protect the interests of the Class members in that she has no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class.  The damages and infringement of rights that Plaintiff suffered are typical of other Class members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class.  Plaintiff has retained counsel experienced in consumer protection class action litigation, and Plaintiff intends to prosecute her action vigorously.

50. ***Superiority of Class Action***.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a

class action will preserve judicial resources by allowing the Class' common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts.  In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

51.    The litigation of the claims brought herein is manageable.  Defendants' uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

52.    Adequate notice can be given to Class members directly using information maintained in the parties' records.

53.    ***Predominance***.  The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

54.    This proposed class action does not present any unique management difficulties.

## FIRST CAUSE OF ACTION

### NEGLIGENCE
### (NEGLIGENCE PER SE and GROSS NEGLIGENCE)

(ON BEHALF OF THE NATIONWIDE CLASS)
AGAINST DEFENDANT

55.    Plaintiff repeats the allegations in Paragraphs 1-54 as if fully set forth with the same force herein.

56.    Defendant had a unique duty to ensure that the supplements it sold into commerce were sold consistent with commonly accepted industry standards, statutory guidance, and federal law.

57.     Plaintiff and Class members are individuals who purchased Defendant's Products seeking mental health treatment.

58.     Defendant had full knowledge of the sensitivity of accessibility to mental health resources; it was entrusted and the types of harm that Plaintiff and Class members could and would suffer if the information were potentially disclosed.

59.     Defendant had a duty to Plaintiff and each Class member to exercise reasonable care in holding, safeguarding and protecting consumers from the harm it caused due to its deliberate failure to disclose material information – including the fact that the Products were not alternatives to controlled substances or prescription mediation, as well as the fact that its "prescription" of Products through its quiz/questionnaire does not have regulatory approval nor is it a replacement the advice and diagnosis of a licensed medical professional.

60.     Plaintiff and Class members were the foreseeable victims of these practices.

61.     Plaintiff and Class members had no ability to protect themselves due to Defendant's conduct because Defendant was in complete control over its advertising and marketing as well as the information which rendered its Products useless.

62.     By collecting their medical data and leading Plaintiff and Class members to believe that their purchases were consistent with medically accepted practices for commercial gain, Defendant had a duty of care to use reasonable means to in their marketing, advertising, and sale of the Products.

63.     Defendant also owed a duty of care to Plaintiff and Class members consistent with federal regulations and law (as discussed herein) as well as to follow commonly accepted industry standards (*e.g.* not comparing their Products to controlled substances, actual prescription

medication, cocaine, or otherwise). The breaches of Defendant's duty of care were foreseeable because they were deliberate in an attempt to drive sales.

64.     In addition, Defendant was negligent per se because had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair ... practices in or affecting commerce," including, as interpreted and enforced by the FTC, as well as under the Food Drug and Cosmetic Act and consistent with regulations promulgated in the federal register.

65.     Defendant breached its duties, and thus was negligent, negligent per se, and grossly negligent, by failing to use reasonable measures to protect the Plaintiff and Class members from the harm they had caused.

66.     The harms caused (loss of time, taking supplements which were misbranded, and potential for side effects) were foreseeable because the guidelines, standards, laws, and regulations that Defendant failed to follow are both commonly known as well as implemented for the very purpose that Defendant opted not to align its business practices with.

67.     Plaintiff and Class members were harmed as a result of Defendant's negligence in the manner alleged herein. Plaintiff and Class members have suffered injury and are entitled to damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

**VIOLATIONS OF NEW YORK'S CONSUMER PROTECTION LAW**
**N.Y. GEN. BUS. LAW § 349**
**("GBL § 349")**

(ON BEHALF OF THE NATIONWIDE CLASS)
AGAINST DEFENDANT

68.     Plaintiff repeats the allegations in Paragraphs 1-54 as if fully set forth with the same force herein.

69.     For purposes of the GBL § 349, Defendants are considered a business and Plaintiff (as well as Class members) are considered consumers.

70.     New York's GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service [. . .]"

71.     Defendant committed deceptive acts or practices by employing false, misleading, and deceptive representations and/or omissions about the health and efficacy of the Products.

72.     Information as to the content in each of their Products was in the exclusive control of Defendant.  Plaintiff could not possibly have known that the Products is devoid of the same critical active ingredients as the FDA-approved medications that Defendant compares the Product to, that the Products were not approved nor medically recognized as a drug capable of treating mental health disorders, and lacked sufficient disclaimers and warnings which should have added clarity regarding the use of these Products.  To compound matters, Defendant made no warning about the potential deleterious side effects their Products could cause.

73.     Because Plaintiff bought these Products, Plaintiff has standing to pursue this claim because she has suffered an economic injury due to lost money or property as a result of Defendant's acts or practices.  When Plaintiff purchased the Products, she relied on false, misleading and deceptive representations that the Products were healthy and fit for the purpose

for which they were advertised, were comparable to prescription medication and were otherwise capable of addressing her mental health disease and/or symptoms.  Plaintiff spent money in the transaction that she otherwise would not have spent had she known the truth about Defendant's Products.

74.    Defendant's conduct was deceptive in a materially misleading way because it violates consumer's reasonable expectations.  Defendant knew consumers would purchase its Products and/or pay more for them under the false – but reasonable – believe that they were healthy to regularly consume for the purposes for which they were advertised.

75.    Defendants know that this health information about its Products, which are specifically marketed toward people with mental health disorders, are material to these types of consumers.  As a result of its deceptive acts and practices, Defendants sold millions of bottles of the Products to unsuspecting consumers nationwide, including in New York.

76.    As a direct and proximate result of Defendants' false, misleading and deceptive representations and/or omissions, Plaintiff and Class members were injured in that they: (1) overpaid for the Products that were not what Defendants represented, (2) were deprived of the benefit of the bargain because these Products were different than what was advertised and marketed, and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than if Defendant had adequately disclosed the actual efficacy of the Product instead of comparing the Product to FDA approved medications.

77.    On behalf of herself and Class members, Plaintiff seeks to enjoin Defendant's unlawful acts and practices – as well as to have warnings added to the packaging of the Products.

78.     Additionally, on behalf of herself and Class members, Plaintiff also seeks to recover her actual damages or $50.00 in statutory penalties, whichever is greater, three times her actual damages, as well as reasonable attorneys' fees

### THIRD CAUSE OF ACTION

**VIOLATIONS OF NEW YORK'S FALSE ADVERTISING LAW
N.Y. GEN. BUS. LAW § 350
("GBL § 350")**

(ON BEHALF OF THE NATIONWIDE CLASS)
AGAINST DEFENDANT

79.     Plaintiff repeats the allegations in Paragraphs 1-54 as if fully set forth with the same force herein.

80.     Defendants engaged in a campaign of false and misleading advertising and marketing with regard to the health of its Products to deceive consumers into believing that the Products were healthy and fit for the purpose for which they were advertised, were comparable to prescription medication and were otherwise capable of addressing her mental health disease and/or symptoms.

81.     Because Plaintiff bought these Products numerous times, Plaintiff has standing to pursue this claim because she has suffered an economic injury due to lost money or property as a result of Defendant's acts or practices.  When Plaintiff purchased the Products, she relied on false, misleading and deceptive representations, as well as omissions to the contrary, which led her to believe that the Products were healthy and fit for their advertised purpose.  Plaintiff spent money in the transaction that she otherwise would not have spent had she known the truth about Defendants' Products.

82.     Defendants' conduct was deceptive in a materially misleading way because it violates consumer's reasonable expectations.  Defendants knew consumers would purchase its

27

Products and/or pay more for them under the false – but reasonable – believe that they were healthy to regularly consume consistent with their advertised purpose.

83.    Defendant knows that this health information about its Products, which are specifically marketed toward people with mental health disorders, are material to consumers. As a result of its false advertising, Defendants sold millions of bottles of the Products to unsuspecting consumers nationwide.

84.    As a direct and proximate result of Defendant's false, misleading and deceptive representations and/or omissions, Plaintiff and Class members were injured in that they: (1) overpaid for the Products that were not what Defendant represented, (2) were deprived of the benefit of the bargain because these Products were different than what was advertised and marketed, and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than if Defendant had adequately disclosed the truth about them.

85.    On behalf of herself and Class members, Plaintiff seeks to enjoin Defendant's unlawful acts and practices. On behalf of herself and Class members, Plaintiff also seeks to recover her actual damages or $500.00 in statutory penalties, whichever is greater, three times her actual damages, as well as reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION

**VIOLATIONS OF LOUISIANA'S CONSUMER PROTECTION LAW**
**La. R.S. 51:1405, *et seq.***
**("LUPTA")**

(ON BEHALF OF THE LOUISIANA SUBCLASS)
AGAINST DEFENDANT

86.     Plaintiff repeats the allegations in Paragraphs 1-54 as if fully set forth with the same force herein.

87.     For purposes of the Louisiana Unfair Practices and Trade Act, Defendants are considered a business and Plaintiff (as well as Class members) are considered consumers.

88.     LUPTA prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service [. . .]"

89.     Defendant committed deceptive acts or practices by employing false, misleading, and deceptive representations and/or omissions about the health and efficacy of the Products.

90.     Information as to the content in each of their Products was in the exclusive control of Defendant.  Plaintiff could not possibly have known that the Products is devoid of the same critical active ingredients as the FDA-approved medications that Defendant compares the Product to, that the Products were not approved nor medically recognized as a drug capable of treating mental health disorders, and lacked sufficient disclaimers and warnings which should have added clarity regarding the use of these Products.  To compound matters, Defendant made no warning about the potential deleterious side effects their Products could cause.

91.     Because Plaintiff bought these Products, Plaintiff has standing to pursue this claim because she has suffered an economic injury due to lost money or property as a result of Defendant's acts or practices.  When Plaintiff purchased the Products, she relied on false, misleading and deceptive representations that the Products were healthy and fit for the purpose

for which they were advertised, were comparable to prescription medication and were otherwise capable of addressing her mental health disease and/or symptoms. Plaintiff spent money in the transaction that she otherwise would not have spent had she known the truth about Defendant's Products.

92.    Defendant's conduct was deceptive in a materially misleading way because it violates consumer's reasonable expectations. Defendant knew consumers would purchase its Products and/or pay more for them under the false – but reasonable – believe that they were healthy to regularly consume for the purposes for which they were advertised.

93.    Defendants know that this health information about its Products, which are specifically marketed toward people with mental health disorders, are material to these types of consumers. As a result of its deceptive acts and practices, Defendants sold millions of bottles of the Products to unsuspecting consumers nationwide, including in Louisiana.

94.    As a direct and proximate result of Defendants' false, misleading and deceptive representations and/or omissions, Plaintiff and Class members were injured in that they: (1) overpaid for the Products that were not what Defendants represented, (2) were deprived of the benefit of the bargain because these Products were different than what was advertised and marketed, and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than if Defendant had adequately disclosed the actual efficacy of the Product instead of comparing the Product to FDA approved medications.

95.    On behalf of herself and Class members, Plaintiff seeks to enjoin Defendant's unlawful acts and practices – as well as to have warnings added to the packaging of the Products.

96.    Additionally, on behalf of herself and Class members, Plaintiff also seeks three times her actual damages, as well as reasonable attorneys' fees.

## FIFTH CAUSE OF ACTION

### UNJUST ENRICHMENT/QUASI-CONTRACT

(ON BEHALF OF THE NATIONWIDE CLASS)
AGAINST DEFENDANT

97.      Plaintiff repeats the allegations in Paragraphs 1-54 as if fully set forth with the same force herein.

98.      Plaintiff and Class members conferred a benefit onto Defendant in the form of gross revenues derived from the sale of the Products as a result of the money paid by Plaintiff and Class online.

99.      Defendant was unjustly enriched in retaining these gross revenues derived from Plaintiff and Class members, and retention of such revenues under these circumstances is unjust and inequitable because Defendant omitted that the Products were not as advertised.

100.     This caused economic injuries to Plaintiff and Class members because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

101.     Defendant accepted and retained the benefit in the amount of gross revenues it derived from sales of the Products to Plaintiff and Class members – and it would be unjust for Defendant to retain these financial benefits – and profits should be placed into a constructive trust and disgorged to Plaintiff and Class members and restitution should be provided for Plaintiff and Class members.

## **REQUEST FOR RELIEF**

102.    Plaintiff, on her own behalf and on behalf of the Class and the Sub-Class, requests the following relief:

    a.  An order certifying the Class and the Sub-Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as Class and Sub-Class Representative and their attorneys as Class Counsel;

    b.  A declaration that Defendants are financially responsible for notifying Class and Sub-Class members of the pendency of this suit;

    c.  An order declaring that Defendants' conduct violates the consumer protection statutes cited;

    d.  Actual damages;

    e.  Statutory damages;

    f.  Trebled damages;

    g.  An order providing appropriate equitable relief in the form of an injunction against Defendants' unlawful and deceptive acts and practices, and requiring proper, complete, and accurate representation and labeling of the Products;

    h.  Restitution for members of the Class to recover Defendants' ill-gotten benefits;

    i.  A disgorgement of profits earned on the products sold as well as a disgorgement of the profits earned on the premiums charged to the Class;

    j.  Pre- and post- judgment interest on all amounts awarded;

    k.  Other injunctive relief as the Court may deem appropriate; and

    l.  An order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMAND

103.    Plaintiff hereby demands a trial by jury.


DATED: Jan. 5, 2025                    Respectfully submitted,

                                       By: */s/ Blake Hunter Yagman*
                                       Blake Hunter Yagman
                                       **SCHONBRUN SEPLOW HARRIS
                                       HOFFMAN & ZELDES LLP**
                                       The Foundry Building
                                       1050 30th St., N.W.
                                       Washington, D.C. 20007
                                       Tel.: (929) 709-1493
                                       *byagman@sshhzlaw.com*

                                       Mason A. Barney*
                                       Tyler J. Bean*
                                       **SIRI & GLIMSTAD LLP**
                                       745 Fifth Avenue, Suite 500
                                       New York, New York 10151
                                       Tel.: (212) 532-1091
                                       *mbarney@sirillp.com*
                                       *tbean@sirillp.com*

                                       *Counsel for Plaintiff Adella Gonzalez
                                       and the Proposed Class*

                                       *PHV Forthcoming